Case No. 21-50498

————————————————

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————————

VANESSA ST. PIERRE,
Plaintiff-Appellant

v.

STANDARD INSURANCE COMPANY;
DEARBORN NATIONAL LIFE INSURANCE COMPANY,
Defendants-Appellees

————————————————

Appeal from the United States District Court for the
Western District of Texas, El Paso Division

————————————————

## BRIEF OF PLAINTIFF-APPELLANT

————————————————

Michael T. Milligan
4171 N. Mesa St., Suite B-201
El Paso, Texas 79902
915-544-5587
Fax 915-544-2773
elpasomike13@aol.com

COUNSEL FOR PLAINTIFF-APPELLANT

Case No. 21-50498

---

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

VANESSA ST. PIERRE,
Plaintiff-Appellant

v.

STANDARD INSURANCE COMPANY;
DEARBORN NATIONAL LIFE INSURANCE COMPANY,
Defendants-Appellees

---

Appeal from the United States District Court for the
Western District of Texas, El Paso Division

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Plaintiff-Appellant certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Plaintiff-Appellant**

Vanessa St. Pierre

**Counsel for Plaintiff-Appellant**

1.    Michael T.  Milligan
      4171 N. Mesa St., Suite B-201
      El Paso, Texas 79902
      915-544-5587

2.    Leticia Dominguez (District Court proceedings)
      4171 N. Mesa St., Suite B-201
      El Paso, Texas 79902
      915-544-7087

**Defendants-Appellants**

1.    Standard Insurance Company

2.    Dearborn National Life Insurance Company

**Counsel for Defendants-Appellants**

1,    Andrew F. MacRae
      Levantino Pace PLLC
      1101 Capital of Texas Highway
      Building K, Suite 125
      Austin, Texas 78746
      512-647-1581

2.    Richard Bonner
      Kemp Smith LLP
      P. O. Box 2800
      El Paso, Texas 79999
      915-533-4424

          */s/ Michael T. Milligan*
      **MICHAEL T. MILLIGAN**
      Attorney for Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant and her counsel do not consider oral argument necessary. The legal errors of the District Court are clear. Plaintiff has no additional arguments beyond those in her brief. The only possible exception is the dispute over the preemptive effect of the Texas Insurance Code on common law agency principles, embedded in Issue Number 2. If the Court decides to resolve that issue instead of including it in the reversal and remand as prayed by Plaintiff-Appellant, then the Court might find oral argument helpful in a limited way.

# **TABLE OF CONTENTS**

**Page**

Certificate of Interested Persons...........................................................i

Statement Regarding Oral Argument...................................................iii

Table of Contents...............................................................................iv

Table of Authorities.........................................................................viii

Jurisdictional Statement......................................................................1

Issues Presented for Review.................................................................2

Statement of the Case..........................................................................3

       A.    Relevant Procedural History.............................................3

       B.    Facts Relevant to the Issues Presented for Review.........................3

       Introductory Note..................................................................3

          A.    Standard's Contract with the City.........................................4

              Standard or "The Standard"...........................................5

              Standard's Promises of Administrative Support.............5

              Appendix: Short Form of Promises................................9

              Appendix: Brochure, Insurability Required....................10

              City Accepts Standard's Offer.......................................11

          B.    Standard's Pocket Veto of Ms. St. Pierre's Application for Supplemental Dependent Life Insurance......................11

              Discuss Fine Print with Representative..........................11

*Caveat Emptor* – Standard's "Split Decision"..................13

C.     Dearborn Replaces Standard..................................15

New Insurer, Same Basic Promises..................................15

Dearborn's Contract with the City.....................................17

2017 Enrollment, Effective 2018......................................18

City's Formal Agreement with Dearborn.........................19

"Inadvertent" or "Clerical Error or Omission".................21

"*Employee Benefit Booklet*"..............................................21

D.     A Widow's Odyssey.............................................22

First Steps...........................................................................22

City Admits Mistake..........................................................22

Formal Claim.....................................................................23

E.     Dearborn Denies the Claim................................24

Similar Breaches by Both Insurers..................................26

Summary of Argument.........................................................28

Argument..............................................................................29

Standard of Review.................................................................29

**Page**

Issue Number 1:  The District Court erred as a matter of law
by not following the pleading standard established by the
Supreme Court and this Court in evaluating the plausibility
of Ms. St. Pierre's Complaint....................................................31

    Omission of Details Supporting General Assurances....................32

    Technological Promises and E of I Consistency in
    Questionnaire and Oral Briefing........................................32

    Wide Disparity Between Promise and Performance of
    Onboarding Assistance....................................................33

    Standard's Undisclosed Pocket Veto..............................................33

    "Reasonably Inferred" vs. "Incorrectly Assumed".........................34

    Omission of Important Facts re Dearborn.....................................34

    Dearborn's Key Allegation Recited; Ms. St. Pierre's
    Denial Ignored................................................................35

    District Court Articulates, But Does Not Apply, Pleading
    Standard........................................................................36

Issue Number 2:  On the applicability of Texas common law
agency principles, the District Court erred as a matter of law
by placing upon Ms. St. Pierre the burden of negating the
unpled and disputed affirmative defense that the Texas
Insurance Code preempted Texas common law.......................................37

    Introduction...................................................................37

    Correct Burden of Pleading and Proof..........................................38

    Texas Common Law of Agency – Preemption Uncertain.............40

    Texas Common Law Agency Principles.......................................41

**Page**

Purpose of Key Insurance Code Provision.....................................42

Issue Number 3:  The District Court erred as a matter of
law by engrafting onto the *Twombly-Iqbal* standard a
requirement, unrelated thereto, for a "connection" or "tie"
or some other sort of linkage between the presumptively
true statements of fact and the causes of action......................................42

No Case Support for Tying............................................................43

District Court's Reliance on Tying Analysis................................45

Conclusion.......................................................................................52

Certificate of Service.......................................................................53

Certificate of Compliance...............................................................53

# <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................30, 43, 44

*Bank of Louisiana v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237
    (5th Cir. 2006)...................................................................................................38

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)...........................................30, 43, 44

*Benefit Trust Life Insurance Company v. Littles*, 869 S.W.2d 453
    (Tex. App.-San Antonio 1993), vacated for settlement
    873 S.W.2d 704 (Tex. 1994)...........................................................................46

*City of San Antonio v. Valemas, Inc.*, 2012 Tex. App. LEXIS 4646
    (Tex. App.-San Antonio 2012).........................................................................50

*Crown Life Insurance Company v. Casteel*, 22 S.W.2d 378
    (Tex. 2000)........................................................................................................40

*Cullivier v. Taylor*, 503 F.3d 397 (5th Cir. 2010)...................................................30

*Fisher v. Halliburton*, 667 F.3d 602 (5th Cir. 2012)........................................38, 39

*Fretz Construction Company v. Southern National Bank*,
    626 S.W.2d 478 (Tex. 1981)...........................................................................50

*Hutcheson v. Dallas County*, 994 F.3d 477 (5th Cir. 2021)...................................29

*Jarvis v. K & E Re One LLC* 390 S.W.3d 631 (Tex. App.-Dallas 2012)...............41

*Johnson v. City of Shelby*, 574 U.S. 10 (2014).......................................................44

*Lennar Corp. v. Great American Insurance Company*,
    200 S.W.3d 651 (Tex. App.-Houston [14] 2006).........................................40

*Life Insurance Company v. Klingler*, 730 S.W.2d 32
    (Tex. App.-Corpus Christi 1987)....................................................................40

**Page**

*Littell v. Houston Independent School District*, 894 F.3d 616
    (5th Cir. 2018.......................................................................29

*MetLife Insurance Company v. Taylor*, 481 U.S. 58 (1987).................................38

*Morgan v. Swanson*, 659 F.3d 369 (5th Cir. 2011, en banc)................................30

*National Plan Administrators Inc. v. National Health Insurance*
    *Company*, 2004 Tex. App. LEXIS 10257 (Tex. App.-Austin 2004)...........40

*Peterson v. Bell Helicopter Textron Inc.*, 806 F.3d 335 (5th Cir. 2015)...............44

*Ramirez v. Escajeda*, 921 F.3d 497 (5th Cir. 2019)..............................................30

*Service Corp. International v. Residential Services, L.P.*,
    129 S.W.3d 781 (Tex. App.-Houston [1st] 2004, pet. denied)....................48

*Universe Life Insurance Company v. Giles*, 950 S.W.2d 48
    (Tex. 1997).................................................................................40

*Walker Insurance Services v. Bottle Creek Power Corp.*,
    108 S.W.2d 538 (Tex. App.-Houston [14] 2003)........................................41

*Woodard v. Andrus*, 419 F.3d 348 (5th Cir. 2005)................................................30

*Woods v. City of Greensboro*, 855 F.3d 639 (4th Cir. 2017)................................31

## Statutes

28 U.S.C. § 191...................................................................................................1

28 U.S.C. §§ 1441 and 1332.................................................................................1

Texas Insurance Code § 4001.003(1)...................................................................37

Texas Insurance Code §§ 4001.051 and .052........................................................39

**Page**

## Rules

Rule 4(a)(1)(B) Fed. R. App. P................................................................1

Rule 12(b)(6) Fed. R. Civ. P.........................................28, 29, 30, 38, 45

Rule 12(c) Fed. R. Civ. P...........................................................................38

Rule 54(c) Fed. R. Civ. P...........................................................................44

Rule 56 Fed. R. Civ.P................................................................................39

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction of this cause under 28 U.S.C. §§ 1441 and 1332 as alleged in the Notice of Removal. ROA.6-7. Diversity of citizenship is established by Plaintiff's Post-Removal Original Complaint. ROA.303. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. 191, final decisions of district courts.   The Final Judgment herein was rendered on May 11, 2021. ROA.704. Under Rule 4(a)(1)(B), Federal Rules of Appellate Procedure, the notice of appeal was due June 10, 2021.  Plaintiff filed her timely Notice of Appeal from the Final Judgment, and the Memorandum Order Granting Defendants' Motion to Dismiss, on June 9, 2021. ROA.705. This appeal is from a final judgment that disposes of all Plaintiff's claims.

## ISSUES PRESENTED FOR REVIEW

1.    The District Court erred as a matter of law by not following the pleading standard established by the Supreme Court and this Court in evaluating the plausibility of Ms. St. Pierre's Complaint.

2.    On the applicability of Texas common law agency principles, the District Court erred as a matter of law by placing upon Ms. St. Pierre the burden of negating the unpled and disputed affirmative defense that the Texas Insurance Code preempted Texas common law.

3.    The District Court erred as a matter of law by engrafting onto the *Twombly-Iqbal* standard a requirement, unrelated thereto, for a "connection" or "tie" or some other sort of linkage between the presumptively true statements of fact and the causes of action.

## STATEMENT OF THE CASE

### A.  Relevant Procedural History

This is a re-filed and removed action by a widow to recover insurance proceeds on her late husband's life from two insurance companies which successively provided group life insurance covering El Paso City employees and their dependents pursuant to contracts between the insurers and the City.  It was originally filed on June 24, 2019, in the 243rd Judicial District Court of El Paso County, Texas, *sub nom* Vanessa St. Pierre v. City of El Paso, Texas, cause number 2019DCV2376. ROA.304. Following removal to federal court, Plaintiff moved to remand but relented after further discussion between the parties' attorneys, and amended to make Dearborn the Defendant on February 5, 2020. ROA.646. Subsequently, the District Court dismissed all of Plaintiff's claims without prejudice on May 28, 2020. ROA.663-664. On November 6, 2020, Plaintiff re-filed suit against Dearborn, but also included Standard Insurance Company as a Defendant. ROA.302. On May 11, 2021, the District Court again dismissed the action for failure to state a claim.  ROA.703. This appeal followed.

### B.  Facts Relevant to the Issues Presented for Review

#### Introductory Note

It is of paramount importance to Appellant that the Court consider all of her facts and supporting evidence, and simultaneously compare to it the District

3

Court's summary, which Appellant respectfully submits is incomplete.  To make that comparison as easy as possible, Appellant has set out verbatim all of the facts she pled at Paragraphs 9 through 49 of her live Complaint (ROA.304-321.) with those mentioned by the District Court (ROA.678-685.) highlighted in gray.  To improve readability and record checking, this section deletes the paragraph numbers in the Complaint, eliminates all quotation marks, and replaces all references to "Attachments" with citations to the Record on Appeal.  Finally, Appellant has inserted bracketed "signpost" headings to further improve readability.  Otherwise, the body of this part of the brief is lifted verbatim from the factual statement in the live Complaint.

## A.  <u>Standard's Contract with the City</u>

On June 23, 2009, the City of El Paso issued a solicitation of offers for outside vendors to provide, inter alia, basic and supplemental life insurance.[1] ROA.328.  Standard submitted its offer on July 27, 2009.  ROA.328.

> [**Note**:  The City's solicitation and Standard's offer, filling in the blanks on the solicitation, have been provided by the City as a single document.  For the sake of clarity, this pleading has separated the

---

[1]  The District Court did not account for most facts in the Complaint, which at least suggests that the District Court may not have taken them as true and drawn all reasonable inferences therefrom.  Therefore, as stated in the Introductory Note, Appellant has highlighted the facts addressed by the District Court to show how this occurred.  This has been done in a good faith attempt to help the Court understand Appellant's main point, that the District Court did not apply correctly the *Twombly-Iqbal* pleading standard.

City's solicitation from Standard's responses to questions from the City.]

**[Standard or "The Standard"]**

Standard's address (920 S.W. Sixth Avenue, Portland, Oregon 97204) (ROA.338.) is important because on the very next page and other places throughout the record, it refers to itself as "**The** Standard," which is the name of a different company located in New York.  See https://www.standard.com/about-standard/company.

**[Standard's Promises of Administrative Support]**

Concerning Standard's assistance to the City and its employees, the City posed the following question and received the following answer in response thereto:

[Question]  "13. Will your representative be able to participate in open enrollment and new employee orientation meetings?  (Open enrollment meetings will be conducted in October.  New employee orientation meetings are conducted twice a month."  [Sic, punctuation error.]

[Answer]  "Yes, we welcome the opportunity to assist The City with orientation meetings as needed.

"The City of El Paso will be serviced by a dedicated National Accounts Management Team.  The team members are led by your dedicated National Accounts Consultant, Jennifer Stacy, who acts as a client advocate and works closely with local sales and service office to meet and exceed your expectations.

"Local Employee Benefits Sales & Service Office:

Standard Insurance Company
2805 North Dallas Parkway
Suite 440
Plano, Texas 75093
(972) 943-1615
(800) 727-7112
(972) 943-1617 Fax

"The activities performed at our local Employee Benefits Sales & Service Office include assistance with enrollment and implementation, as well as general service and contract issues. This office will be your primary contact for new employee orientation meetings, led by both Jennifer Stacy (Portland) and Derek Jones (Dallas)."

ROA.341; Record Excerpts, Tab 5.

The next question further pursued the issue of services promised by

Standard:

[Question] "14. Each successful bidder must provide a sufficient number of representations [sic] to properly enroll all eligible employees who wish to enroll during the initial open enrollment period and at each annual open enrollment. Please indicate your agreement."

[Answer] "The Standard wants our policyholders to experience a smooth and comfortable transition and The City of El Paso's dedicated National Accounts management team will manage every aspect of the implementation process from start to finish.

"As an Implementation Analyst will manage every aspect of the initial enrollment period as well as work with other National Accounts team members to create custom enrollment materials, deliver contracts and certificates, clarify claims processes, assist with benefit design, help with payroll administration and verify your reporting and billing requirements.

*    *    *

6

"Additionally, after the effective, date implementation resources will finalize implementation tasks, ensuring accurate premium billing, training on e-services, and smooth claims administration and reporting." [Sic, punctuation error]

ROA.341-342.

After discussing the claims process, which is not at issue in this case, the questionnaire proceeds to the critical element of how the employees can learn vital information about insurance coverage:

[Question]  "18.   Provide a sample of all standard communication material that will be provided to the City of El Paso for annual enrollment and use throughout the year."

[Answer]  "*ENROLLMENT STRATEGY:*

"The [sic] Standard provides a full range of enrollment services and we can create a customized marketing and enrollment strategy for the City of El Paso's Life and Disability Insurance Program.  The proposed strategy for The City's plan is to develop an array of personalized information and enrollment tools using a combination of direct mailings and technology based services such as:

*"Customized precommunication and enrollment materials targeted to employees*
● Announcement and endorsement letters
● Posters, payroll stuffers, and training materials

*"Personalized Enrollment Form System*
● Paper forms customized with the employee's individual plan benefit and premium information
● Customized Online and Interactive Voice Response (IVR) Enrollment system

"Utilizing these services we are confident employees will be able to make an informed benefit purchase decision.

"Sample communication materials have been provided for your review. These materials include informational brochures designed to educate and inform your employees of the coverage offered. We are able to customize these materials to the City's specific plan designs, population and needs. Please find the same materials in Section 5.

"Normal costs for enrollment, communication, and implementation materials are included.

"Please see same communication materials located in Section 5."

ROA.343-344.

The following question and answer are inconsistent with commitments made at ROA.352; Record Excerpts, Tab 6:[2]

[Question] "19. What services are available on-line to:
a. City of El Paso Benefit Staff for management of the Plan

[Answer: Page and a half of materials listed.]

"b. City of El Paso employees enrolled in the plan for customer service."

[Answer] "At this time, The Standard offers online claim form submission for employers only."

ROA.344-345.

After some questions not related to this suit, the questionnaire shifts to the topic, **Life Questionnaire** (ROA.347.) begins renumbering, and obtains the following commitments from Standard:

---

[2] See discussion at pages 9-10 of this brief.

[Question]  "4.  Will you offer a one time special open enrollment opportunity offering guarantee issue without evidence of insurability to all eligible applicants?"  [**Note:** No distinction between employee and dependent supplemental life coverage.]

[Answer]  "Yes."

\*    \*    \*

[Question]  "6.   What is the guaranteed issue amount for life insurance? What evidence of insurability is required?  What is your turnaround for the EOI process?"

[Answer]  "The guaranteed issue amount for voluntary life insurance is $200,000."  [Standard did not answer the other two questions.]

ROA.348.

## [Appendix:  Short Form of Promises]

The appendices to the proposal start with a money-back guarantee of satisfaction, but the payback is only 5 percent.  ROA.350.  From there, it describes an all-electronic operation of the program, trademarked "**AdminEASE**<sup>SM</sup>."  ROA.350-352.  Since they are mostly directed to the employer (the City, in this case), it is reasonable to infer that Standard expected the City to set up the program and teach the employees how to use it, which is very different from the "hands-on" approach laid out in response to the questionnaire.  ROA.350-351.  [Cf. pages 5-8, supra, this brief.]  ROA.338-348; highlighted portions.

Presumably after learning the system from the employer, employees are guaranteed "**personalized employee enrollment experience**, . . . allowing them to

directly manage their insurance affairs," including "complete evidence of insurability electronically" and access to a "multilingual call center during enrollment periods." ROA.351-352.

The Attachment goes on to guarantee access to an electronic "Medical History Statement" web form "simple and easy to submit online saving employees and employers time." ROA.352. All-electronic management, Standard says, would also enable the employer to monitor online applications and "monitor applications that require medical underwriting," including "whether Standard has received a particular application, its status, coverage amounts, and ability to fit the data into a spreadsheet." ROA.352.

## [Appendix: Brochure, Insurability Required]

Also attached to Standard's proposal was a copy of its brochure entitled "Group Life Insurance" (ROA.353-366.), which differs from the questionnaire. As set out above, in response to the questionnaire, Standard said the guaranteed amount of life insurance was $200,000, and it did not respond to the question about evidence of insurability. The brochure says supplemental life insurance is available in the amount of up to $300,000, but proof of insurability is necessary for employees and their spouses. ROA.363; Record Excerpts, Tab 7.

10

**[City Accepts Standard's Offer]**

On December 11, 2009, the City accepted Standard's offer incorporating as the final agreement "the solicitation, [Standard's] offer, and the Purchase Order(s)" as the "final and complete repository of the agreements between the City and Standard Insurance Company." ROA.369.  Future City employees, such as Ms. St. Pierre, were intended third party beneficiaries of the agreement between Standard and the City.

## B.  Standard's Pocket Veto of Ms. St. Pierre's Application for Supplemental Dependent Life Insurance

**[Discuss Fine Print with Representative]**

Ms. St. Pierre became an employee of the City of El Paso ("the City"), and therefore a third party beneficiary of the contract between Standard and the City, on or about August 11, 2014.  On or about the second day of her in-processing as an employee, she received the Non-Uniform Employee Benefits Summary (ROA.371; Record Excerpts, Tab 8), containing the following information about life insurance coverage from Standard, pertinent to this suit:

> "**Basic Life** [emphasis in original] [following in ultra-fine print].  All eligible employees have $50,000 in Life coverage; $2,000 life cvg for spouse; and $1,000 life cvg for each eligible dependent child.

> **Supplemental Life** [emphasis in original].  Approvals up to $200,000 are guaranteed for new employees.  After 30 days of continuous employment, changes can only be made with a qualifying life event or through Open Enrollment and subject to medical underwriting. Evidence of Insurability application for underwriting process will be

required with waiting period of approximately six (6) weeks for an answer from carrier.  Plan is age-graded term life policy."

ROA.371.  The language about guaranteed approval for new employees was consistent with both Standard's answer to the City's questionnaire [see pages 8-9, supra, this brief] (ROA.348.) and the oral presentation about life insurance.

After completion of the briefing, the last item in the exhausting second day of the three-day orientation was for employees to fill out a six-page form containing all of their elections about the various optional benefit plans available. ROA.374-379.  There was no option for online enrollment, as explicitly promised, discussed above at pages 8-9, supra, this brief.  The first page of the enrollment form unhelpfully advised the new employees to "keep a copy of this form for your records," without a copy machine anywhere in sight.  The guaranteed approval of up to $200,000 for new employees with no need for evidence of insurability was replaced in fine print, "Supplemental Life After Tax *$200,000* (written in) Pending E of I _____."  Below that it says "Dependent Life – spouse - *$100,000* (written in) Pending E of I _____."  ROA.376; Record Excerpts, Tab 9.  Also gone was the promised participation of a Standard representative during the initial enrollment (ROA.341; Record Excerpts, Tab 5), replaced by a loophole of unknown origin:

**"TO ENROLL OR MAKE CHANGES IN THE FOLLOWING PLANS (SUPPLEMENTAL LIFE, DEPENDENT LIFE AND SHORT TERM DISABILITY, YOU MUST MEET WITH A REPRESENTATIVE.  THEY WILL BE AVAILABLE DURING THE ENROLLMENT SESSIONS."**

ROA.376. There was no Standard representative in attendance. Standard simply stood up the employees and, at least on paper, made it impossible to enroll in any of the life insurance plans.

### [*Caveat Emptor* – Standard's "Split Decision"]

There was nothing about electronic evidence of insurability or even rudimentary information about how to provide "E" of it, nor in fact any information whatsoever how "E of I" goes from "pending" to "active" or "satisfied" status.    Standard's promise of "help with payroll administration," verification of the City's "reporting and billing requirements," and "ensuring accurate premium billing" [pages 7-8, supra, this brief] [ROA.343-344.] all went out the window, replaced by:

> **"I UNDERSTAND THAT IT IS MY RESPONSIBILITY TO VERIFY THAT ALL PAYROLL DEDUCTIONS AS STATED ABOVE ARE CORRECT AND TO REPORT ANY DISCREPANCIES IN DEDUCTIONS ON MY PAYCHECK TO THE INSURANCE AND BENEFITS DIVISION IMMEDIATELY TO GUARANTEE PROPER COVERAGE AND CONTRIBUTIONS."**

ROA.379. Not only did the City, clearly acting as Standard's agent, excuse it from important responsibilities it had assumed, but also gave it another helpful loophole: the employees were not given a rate sheet or any other means of computing what premiums they ought to be paying.    Finally, there are no deductions "stated above" anywhere in the enrollment form.

The only reasonable inference to be drawn from the wide disparity between the hands-on guidance Standard promised and the City's defective operation of its benefit plan five years later was a failed delegation, if not a complete abdication, of Standard's contractual duties to the City.  Although not even eligible to perform as an agent under the Texas Insurance Code, the City nevertheless acted as agent of Standard under Texas principles of common law, and Standard is liable for the City's conduct under the common law doctrine of respondeat superior, which is not preempted by any portion of the Texas Insurance Code.

One thing the City did right was that it transmitted Ms. St. Pierre's application to Standard, without evidence of insurability from either Mr. or Mrs. St. Pierre.  That transmission is an undisputable fact because Standard did whatever was necessary to put Ms. St. Pierre's $200,000 of insurance into effect, and the City began deducting premiums for insurance on her life no later than September 12, 2014.  ROA.381; Record Excerpts, Tab 10. In that respect, at least, Standard complied with its explicit 2009 promise to the City of guaranteed life insurance of $200,000 issued to new employees.  [Pages 8-9, supra, this brief.] [ROA.348.] As noted [above], Standard did not answer the question about the "E of I" prerequisite.  By August of 2014, it had apparently given a two-part answer as to the E of I requirement:  no as to employees; yes as to dependents.  Having made this decision, Ms. St. Pierre's application was granted in part and denied in part,

but nobody told Ms. St. Pierre what had happened and why. She reasonably inferred, from the City's deduction from her pay of money for "Optional Life After Tax DED," that she had insurance on her life and her husband's.

From 2014 through her husband's death on August 31, 2018, Ms. St. Pierre had no reason to suspect that Standard and the City had mishandled her application so badly. Instead, she reasonably inferred, from the biweekly pay deductions for insurance, that they had behaved like the normal institutions they apparently were. At least as of 2009, Standard's life insurance brochure contained nothing about how an employee could resolve problems with a life insurance policy except the following:

> "Should you have any questions or need additional information please contact your insurance advisor or the Employee Benefits Sales and Service Office for your area."

ROA.355. A reasonable person in Ms. St. Pierre's circumstances would have believed that she had $100,000 worth of coverage on her husband's life.

### C. **Dearborn Replaces Standard**

### **[New Insurer, Same Basic Promises]**

Perhaps wanting better support from its underwriter, on July 26, 2017, the City requested proposals from employee benefit plans (ROA.383-388.), including a requirement that proposals "identify and explain your online eligibility and enrollment capabilities." ROA.386. The solicitation stated: "The successful

offeror's proposal will be incorporated into the final contract." ROA.387. There was also an indemnity clause requiring the bidder to indemnify the City against any possible claims. ROA.388.

Dearborn submitted its proposal in response to the City's request on July 31, 2017. ROA.390-396; Record Excerpts, Tab 11. In the first sentence, the proposal identified Dearborn's agent as "Marc Hernandez of T.E.B. Benefits Group." The Court can take judicial notice of T.E.B. Benefits' registration with the Secretary of State, which gives a home office address of 702 Wyoming Avenue, El Paso, Texas 79902.

Dearborn's proposal began with a five-page "Introduction and Overview" making, inter alia, the following commitments:

- "An Account Service team to make the transition to Dearborn National smooth and effective with minimal interruption to your employees."

- Leadership "by an Account Manager who will work with your assigned employment coordinator . . . [and] be responsible for day to day contact with your chosen staff to answer . . . questions and to ensure service needs are handled quickly and effectively."

- Account Manager will [inter alia] "provide strategic account management and consultation; support the City during the renewal process

and ensure seamless transition" by participation in every facet of the transition process.

  ● Account Service team will have "ongoing meetings," create and review draft contracts and certificates, **facilitate client service training**, work with City's "benefit staff," and conduct annual feedback services [emphasis supplied].

  ● [Dearborn's] "Beneficiary Resource Services program helps beneficiaries and their families cope with sorrow and change."

ROA.394-395.

On November 1, 2017, Dearborn submitted a "final offer" to the City containing, inter alia, the following terms not considered in its July 31 proposal:

> "A one-time modified open enrollment with Life Insurance amounts of $50,000 for employees and $20,000 for spouses up to the Guarantee Issue Limit. Anyone wishing coverage over the Guarantee Issue Limit would still need to submit evidence of insurability. **In the event someone does not wish to change their elected amounts, the current amounts will be grandfathered.**"

ROA.398; emphasis supplied.

## [Dearborn's Contract with the City]

The City accepted Dearborn's "offer" on November 28, 2017 (ROA.401.), without differentiating between the initial proposal and the "best and final offer." ROA.398. The Notice of Award stated: "The contract comprised of the solicitation, your offer, and the purchase order(s) constitutes a final and complete repository of

17

the agreements." ROA.401; Record Excerpts, Tab 12. The City would not submit a formal, written application to Dearborn for group life until December 14, 2017, the last day of Open Enrollment.   [See Page 21, infra, this brief.]   ROA.416-417. Dearborn would not issue a policy until on or about January 1, 2018.   [See pages 21-22, infra, this brief.]  ROA.433-468.

The City's request for proposals and Dearborn's proposal total nearly 200 pages. The City's pre-enrollment information and enrollment form contain a scant 18, apparently prepared without input from Dearborn.  The Notice of 2018 Open Enrollment (ROA.403-411.) is not written in plain, readable, understandable language. For instance, it instructs employees, "Make sure you review the supplemental life insurance rate sheet because your rate increases as you move up into the next age group." ROA.410. There is no rate sheet provided.  The brochure does contain, however, this one exception to its general lack of clarity:

> **"You will only have to re-enroll if you are making changes**.  If not, your current plans will roll over to the next year and the rates will be adjusted accordingly."

ROA.411; emphasis in original.  However, it does not tell employees how to verify their current plans nor the rate they should be paying.

### [2017 Enrollment, Effective 2018]

When Ms. St. Pierre attended the open enrollment session on December 13, 2017, she filled out the enrollment form in her own handwriting, except for the

rates for employee and spouse/dependent life insurance. She told the HR rep that she did not know the rates to put in the blank provided, but she wanted the same coverages as she previously had. Not surprisingly, given the brochure's language, he wrote "Same" in both spaces for both insurance coverages. He also checked the box for "Employee + Dependent(s)." The handwriting and the pen used clearly show that portion of the form was not completed by Ms. St. Pierre. ROA.413; more legible copy at Record Excerpts, Tab 13. In very fine print just below the HR rep's handwritten entries is the following confusing language:

> "Employees may increase their supplemental life volume [sic] without Evidence of Insurability (E of I) by up to $50,000 not to exceed a total of $200,000. Spouses may increase their supplemental life volume [sic] without E of I) [sic – punctuation error in original] by up to $20,000 not to exceed $20,000. Any increased amount in excess of these limits is subject to E of I."

As in 2014, there was the same "bricks without straw" requirement "to verify that all payroll deductions are correct and report any discrepancies in deductions on my paycheck to the HR benefits services immediately to guarantee proper coverage and contributions," but without a rate sheet to make the necessary calculations. ROA.414.

### [City's Formal Agreement with Dearborn]

On December 14, 2017 (the last day of open enrollment), the City made a purchase order to Dearborn for group life insurance (ROA.416-417.), even though it had already marketed Dearborn insurance coverage as set out above. In its

19

purchase order, the City as "Policyholder" represents that coverage of individual employees ("insureds") is subject to approval of their applications by Dearborn after any required "medical underwriting," a term not defined in the agreement. The City and its employees "are subject to all policy terms and provisions and trust agreements," the full content of which is presently unknown to Ms. St. Pierre. The City is responsible for collecting and paying the premiums to Dearborn, sending employees' applications to Dearborn, giving "certificates" to the employees, reporting group changes to Dearborn, and keeping records of employee eligibility. The City expects Dearborn to agree, at least implicitly, to issue a "master policy and certificates." ROA.417. Ms. St. Pierre is presently without complete knowledge as to compliance, vel non, with any of those undertakings by the City or Dearborn.

On or before January 1, 2018, Dearborn accepted the City's application (ROA.416-421.) and issued a life insurance policy. ROA.423-431. Its provisions are restricted to the eight meager pages of the policy itself, the certificate of coverage, the City's application, and the employees' signed enrollment forms. ROA.426. There is a rate addendum attached (ROA.427.), but employees had no access to this document. It almost seems like Dearborn was attempting to absolve itself of all the reassuring language in its initial response to the RFP (ROA.390-

396.), its final offer (ROA.398-399.), the Notice of Open Enrollment (ROA.403-411.), and the City's purchase order.

### ["Inadvertent" or "Clerical Error or Omission"]

However, the policy made one significant promise to the employees themselves:  An "inadvertent" or "clerical error or omission" by Dearborn "will not prevent an *employee* from receiving coverage, if he is entitled to coverage under the terms of the policy; or cause coverage to begin or coverage to continue for an employee when the coverage would not otherwise be effective."  ROA.461. The clause continues that if the City gives Dearborn "information about an employee that is incorrect, [Dearborn] will use the facts to decide whether the employee has coverage under the policy and in what amounts; and make a fair adjustment of the premium."  ROA.461.

### [*Employee Benefit Booklet*]

On January 2, 2018, Dearborn created a 32-page document entitled "**Term Life and AD&D Insurance**," subtitled "*Employee Benefit Booklet,*" for the City of El Paso.  ROA.433-468.  The first page is a certificate of the policy issued by Dearborn to the City (ROA.423-431.), but does not include the complete policy, especially not the all-important rate sheet.  Thus it required employees, in the absence of access to rate sheets, to queue up at the Benefits Department just to be on the safe side.  Ms. St. Pierre never knew this document existed until after her

husband had died, she went looking for information, and found it on the City's website as set out in the next paragraph.

### D.  <u>A Widow's Odyssey</u>

### [First Steps]

On or about August 31, 2018, Ms. St. Pierre's husband passed away.  That was and is the accrual date for any causes of action related to her husband's coverage under any life insurance policy.  On or about September 11, she called the Benefits Department to inquire about how to obtain her late husband's insurance benefits.  The person who answered the phone told her that she had no dependent coverage on her husband's life.  Ms. St. Pierre asked to speak to a supervisor, and received the same answer.  On September 12, 2018, Ms. St. Pierre emailed the first page[3] of the 2017 Enrollment Form to the Benefits Department. ROA.413; Record Excerpts, Tab 13.  About this same time, she discovered Dearborn's Employee Benefit Booklet (ROA.433.) on the City's website and began to realize the damage she had suffered from the mistakes committed by Dearborn and the City.

### [City Admits Mistake]

Ms. St. Pierre then took her case to Mary Michel, Human Resources Assistant Director.  ROA.471-472.   On or about October 2, she met with Ms.

---

[3] The second page was obtained from Dearborn through informal discovery under Rule 26(f) Fed. R. Civ. P.

Michel, Zulema Perez (also from HR), and T.E.B. employee Brenda Kinderman, representing Dearborn's interests. Ms. Michel and Ms. St. Pierre disagreed about whether she had ever received the form to provide evidence of insurability.[4] Ms. Michel admitted the City's mistake in failing to deduct the premiums, apparently not having connected the dots implicating Standard. See pages 13-15, supra, this brief. She offered to settle the claim for $20,000, but Ms. St. Pierre declined and instead retained the undersigned attorney, who submitted a claim for benefits. ROA.474.

### [Formal Claim]

At Dearborn's insistence (ROA.477.), Ms. St. Pierre herself filled out a claim form (ROA.479-481.), dated November 20, 2018, and sent it to Dearborn, which responded that its "family is working on your behalf" and offering help "with the unique challenges that result from losing a loved one." ROA.483-484. On December 12, 2018, Dearborn sent her a $2,000 check, the minimum amount of dependent life insurance for employees who make no election for higher coverage. ROA.490.

On February 15, 2019, Ms. St. Pierre's attorney requested notice of the amount of premiums which the City had mistakenly failed to deduct from her pay, so that she could tender the amount by cashier's check to the City of El Paso.

---

[4] The District Court prefaced its recitation of this fact with the words, "According to Plaintiff."

ROA. 492. Neither Dearborn or the City ever responded to that request. That did, however, trigger a letter by the City to Dearborn, an inartfully termed "tender [sic] of defense and indemnity of third party claim." ROA.494-496. The letter does, however, refer to "Part 7 [Contract Clauses], Section 4 [Indemnification]," the fifth page of Attachment 9 [ROA.388.] hereto, which obligates Dearborn to indemnify and defend the City, not vice versa. The important thing is that both the City and Dearborn rejected Ms. St. Pierre's offer to correct the City's oversight by paying whatever money it should have deducted.

By letter dated April 1, 2019, the City informed Ms. St. Pierre, through counsel, that it had "tendered[5] your client's dependent life insurance claim to Dearborn National for handling." ROA.497.

### E.  Dearborn Denies the Claim

By letter dated May 16, 2019, Dearborn denied Ms. St. Pierre's claim. After two pages of boilerplate (ROA.499-500.), it asserted, by fair implication, that Ms. St. Pierre was responsible for all of her misfortune (ROA.501-502.):

- She should have known somehow that she had no coverage on her husband's life;

- She should have known to request an E of I form, how to fill it out, and where to send it;

---

[5]  Someone in the City's HR Department really likes the word "tender."

●      She should have known that the City was not deducting the correct amount from her paychecks to cover insurance on her life and her husband's; and

●      The reason she should have known all this is because, on November 17, 2016, she "logged into the employee benefits system to review her benefits and made no changes."

The first three statements assume a level of knowledge, sophistication, and downright suspicion of her employer's competence and honesty, which only a tiny percentage of any work force could have.  The last statement, that she reviewed her benefits, is made with reckless disregard of the truth.  It is based on an Excel spreadsheet, provided by the City to Dearborn, containing 3,370 lines of data, line 2,768 of which shows that Ms. St. Pierre logged onto the City's benefit system website, but does not show that she reviewed her benefits.  Ms. St. Pierre alleges as fact that the sole purpose of that visit was to indicate that she wanted to make no change in her benefits.  She has solemnly affirmed that fact in response to discovery in the earlier action, dismissed **'WITHOUT PREJUDICE**." At the time, she had no reason to believe that Dearborn's predecessor had granted her application for insurance on her own life, but denied – without acknowledgment or explanation – the portion of her application seeking to insure her husband's life.

That failing on the part of Standard was the original cause of Ms. St. Pierre's misfortune. It received her enrollment form covering her and her husband, with no E of I for either, and then caused the City to deduct only the premium for employee coverage. How and why they did that is not within Ms. St. Pierre's present knowledge. Because she had no coverage on her husband's life, she was ineligible for "grandfathering." The logical response from Dearborn would have been to point this out.

### [Similar Breaches by Both Insurers]

The most plausible explanation why Dearborn did not blame Standard is that both companies did basically the same thing: they each made promises to the City which they knew, or should have known, they were not going to keep. In 2009, Standard assured the City that it would participate in one open enrollment and 24 new employee orientation meetings per year. ROA.341. At the time, Standard had 2,452 contracts in the state of Texas (ROA.339.), serviced by only 33 employees in the entire state. Fifty round trips to El Paso a year for only a single client seems like an insurmountable burden. Five years in, Standard sent nobody to El Paso, but the City made Ms. St. Pierre sign a statement that she had to "meet with a representative" in order to submit an application. ROA.376.

Dearborn had at least two agents in El Paso, Marc Hernandez and Brenda Kinderman, located within easy walking distance from El Paso City Hall, and

neither one of them was there to prevent or correct the ongoing mistakes in the City's enrollment process, the very first under the new contract.

Furthermore, Dearborn had a chance to correct Standard's mistake by looking at Ms. St. Pierre's 2018 enrollment form, seeing that it sought grandfather coverage for somebody who wasn't signed up, and notifying the City, if not Ms. St. Pierre herself, of the need to correct the problem.

No later than August 12, 2014, and continuing at least through January 1, 2018, Standard and Dearborn stopped performing the enrollment duties which they had assumed by their respective contracts with the City. By words, acts, failures to act, or other means presently unknown to Ms. St. Pierre, they delegated these responsibilities to the City, either knowing or chargeable with knowledge that the City did not have the expertise and wherewithal to perform Defendants' enrollment obligations without close supervisions and assistance from Defendants. Predictably, the City employees functioning in place of insurance company representatives made errors which both insurers compounded by their inattention to the enrollment forms.

## SUMMARY OF ARGUMENT

This case is about how and why Vanessa St. Pierre received the second worst news any widow can receive. First, of course, is that her husband has passed away. Second is that she does not have the life insurance she thought she had. With the help of her attorney, she put together a plausible case of how it was not her fault, and that various Texas statutes and its common law entitled her to relief. The District Court thought otherwise and dismissed her case under Rule 12(b)(6) Fed. R. Civ. P. as interpreted by what has come to be known as the *Twombly-Iqbal* analysis. In so doing, the Court committed three reversible legal errors.

First, it failed to apply the *Twombly-Iqbal* pleading standard. It pretermitted any references to Ms. St. Pierre's most important factual allegations and did not characterize a single one of them as implausible. It only mentioned "drawing all inferences" three times in its discussion, without drawing any inferences in her favor. The words "light most favorable" do not appear anywhere except in the articulation of the pleading standard.

The Court's second error was to require Ms. St. Pierre to show that the Texas Insurance Code **did not** preempt Texas common law of *respondeat superior*. The Supreme Court and this Court have both held that preemption is an affirmative defense which a defendant must plead and prove. Whether the Texas Insurance Code preempts the common law is an open question. Some provisions

of the Code have been held preemptive of the common law; others have not.  The outcome of those cases and the language used by the deciding courts at least suggest the plausibility of non-preemption in this case.

The District Court's third legal error was to rule Ms. St. Pierre's complaint deficient because it failed to "show a connection between her legal claims and the facts pled" and "failed to tie any of her factual averments to her causes of action in her complaint."  The Court did not cite any authority for this apparently new requirement, and the Supreme Court has rejected it in very emphatic language.  This Court has held such a requirement may exist at a much later stage of the proceedings.

## ARGUMENT

### Standard of Review

A District Court's dismissal under Rule 12(b)(6) is reviewed de novo, accepting all well pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs.  *Hutcheson v. Dallas County*, 994 F.3d 477, 481-482 (5th Cir. 2021); *Littell v. Houston Independent School District*, 894 F.3d 616, 622 (5th Cir. 2018).  All three issues presented herein are questions of law:  the pleading standard, burden of pleading and proof on preemption defense, and pleading requirements more onerous than those prescribed under current governing law.

In the District Court, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face if it contains "factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff's burden at the 12(b)(6) stage is not heavy; she need only "raise a right to relief above the speculative level." *Cullivier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2010).

The Supreme Court has used some significant cautionary language about 12(b)(6) in the *Twombly-Iqbal* era. "A well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. This Court has recently noted that "*Iqbal* does not allow us to question the credibility of the facts pleaded [but] instead tells us to assume the veracity of well pleaded factual allegations." *Ramirez v. Escajeda*, 921 F.3d 497, 501 (5th Cir. 2019). Before and after *Twombly-Iqbal*, this Court has held and continues to hold, "the complaint must be liberally construed with all reasonable inferences drawn in the light most favorable to the plaintiff." *Morgan v. Swanson*, 659 F.3d 369, 401 (5th Cir. 2011, en banc); and *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005).

The Fourth Circuit's language on this general subject is emphatic:

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of these facts is impossible, and that a recovery is very remote and unlikely. Manifestly, the rule of *Iqbal/Twombly* was not intended to serve as a federal court door-closing mechanism for arguably weak cases, even assuming this case fits the description of 'arguably weak.' Whether [the plaintiff] will have a difficult time establishing the merits of its claim is of little import now. The question before is not whether [the defendant] will ultimately prevail . . . but whether [the] complaint was sufficient to cross the federal court's threshold." [Internal quotation marks and citations omitted.]

*Woods v. City of Greensboro*, 855 F.3d 639, 652-653 (4th Cir. 2017).

## <u>Issue Number 1</u>

**The District Court erred as a matter of law by not following the pleading standard established by the Supreme Court and this Court in evaluating the plausibility of Ms. St. Pierre's Complaint.**

The pleading standard articulated above has a series of clearly defined elements:

a.    The overarching standard of evaluating pleading sufficiency is plausibility;

b.    All statements of fact in the complaint must be taken as true;

c.    The allegations must be liberally construed;

d.    All reasonable inferences must be drawn in the light most favorable to Ms. St. Pierre; and

e.    There cannot be any credibility determinations.

The raw data supporting Ms. St. Pierre's claims in the appendix to her Complaint is 176 pages long. In the Complaint, she boiled that raw material down

into 18 double spaced pages, reproduced verbatim in the factual portion of this brief.

### Omission of Details Supporting General Assurances

The District Court's statement of facts is only about six and a half pages long. ROA.679-685. The Court began with a brief description of Standard's general assurances to the City, but said nothing about its detailed description of how its named representatives, only two at locations far from El Paso, would supposedly participate in annual open enrollment and twice monthly new employee meetings, manage every aspect of initial enrollment, ensure accurate premium billing, provide detailed information to ensure "employees will be able to make an informed benefit purchase decision," customized informational brochures, and "guaranteed issue" of $200,000 in life insurance for employees (with no mention of spousal coverage).

### Technological Promises and E of I Consistency
### in Questionnaire and Oral Briefing

The District Court also did not acknowledge how Standard promised there would be electronic ways to provide evidence of insurability and a medical history statement web form enabling employees to monitor online applications and those requiring medical underwriting, including whether Standard has received the necessary paperwork and other processing information. There was no mention of Ms. St. Pierre's allegation (presumed true) that guaranteed approval was consistent

with both Standard's answer to the City's questionnaire and the oral presentation about life insurance.

### Wide Disparity Between Promise and Performance of Onboarding Assistance

After saying nothing about Standard's specific reassurances to the City about having its representatives at new employee onboarding, the District Court did note that no Standard representative was present when Ms. St. Pierre filled out her enrollment form. That fact had little impact without considering the undisputed documentary evidence that Standard made the City a lot of promises of support and then actually provided none. Furthermore, the Court did not discuss the plain inconsistency between requiring life insurance applicants to meet with a representative, but not having one present. Since the District Court had not mentioned the wide disparity between Standard's promises and its nonperformance, it did not discuss Ms. St. Pierre's suggestion that the Court infer delegation to or abdication of Standard's contractual duties to the City. ROA.311.

### Standard's Undisclosed Pocket Veto

Another critical fact missing from the District Court's summary is the indisputable transmission of Ms. St. Pierre's application – for both insurance coverages – to Standard without evidence of insurability from either Mr. or Mrs. St. Pierre. In the application process, Standard had committed itself to one time issuance of life insurance without evidence of insurability, with no distinction

between employee and dependent coverage.  By the time Ms. St. Pierre arrived, the oral presentation was consistent with that commitment, but the written application said it was required as to both.  Ms. St. Pierre applied for both, reasonably expecting she would be notified of any deficiencies.  Barely a month after in-processing, Ms. St. Pierre noticed insurance premiums being deducted from her pay, with no indication that only one of her applications had been granted.  The unescapable inference is that Standard had split the difference in proof of insurability, waiving it for employees, but requiring it for spouses.

### "Reasonably Inferred" vs. "Incorrectly Assumed"

With no access to a rate sheet, Ms. St. Pierre "reasonably inferred" (ROA.312.) that both applications had been granted.  Despite the obligation to take all statements as true and draw all reasonable inferences therefrom, the District Court changed "reasonably inferred" to "incorrectly assumed." ROA.681. It is settled law that the Court must draw all reasonable *inferences* from the facts pleaded.  The District Court implicitly rejected the inferences suggested by Ms. St. Pierre without explanation and by using a different term, which calls to mind a familiar crude expression about the word "assume."

### Omission of Important Facts re Dearborn

There were also significant deletions of facts alleged about Dearborn, notwithstanding their presumption as true.  The District Court omitted the name of

Dearborn's agent, Marc Hernandez, while identifying his company as T.E.B. Benefits Group, and did not take judicial notice of T.E.B. Benefits Group's address, 702 Wyoming Avenue, which is walking distance from City Hall. ROA.313. A few paragraphs later, it omitted that Brenda Kinderman, Dearborn's representative in Ms. St. Pierre's meeting with Mary Michel, was also a T.E.B. employee. ROA.684. The opinion also failed to mention that Standard had only two people conducting employee orientation, Jennifer Stacy in Portland and Derek Jones in Dallas. ROA.341. Dearborn/T.E.B. had two employees within walking distance of City Hall, and should have provided much better support than Standard.

### Dearborn's Key Allegation Recited; Ms. St. Pierre's Denial Ignored

Perhaps the most significant omission in the District Court's summary of Ms. St. Pierre's allegations, all presumed true, concerns Dearborn's reasons for denying her claim, all of which accuse her various supposedly avoidable mistakes which caused her misfortune, including the presumed smoking gun:

> "Further, Defendant Dearborn informed Plaintiff that it had electronic data that she had logged in to the online employee benefits system on November 17, 2016, **to review her benefits** and that she issued no changes [citations omitted]. Since Plaintiff did not issue changes then or during the open enrollment session on December 13, 2017, the coverage was never approved [citation omitted]."

ROA.685. (emphasis supplied). The Court did not mention Ms. St. Pierre's reply, which must be presumed true:

"The last statement, that she reviewed her benefits, is made with reckless disregard of the truth.  It is based on an Excel spreadsheet, provided by the City to Dearborn, containing 3,370 lines of data, line 2,768 of which shows that Ms. St. Pierre logged onto the City's benefit system website, but does not show that she reviewed her benefits.  Ms. St. Pierre alleges as fact that the sole purpose of that visit was to indicate that she wanted to make no change in her benefits.  She has solemnly affirmed that fact in response to discovery in the earlier action, dismissed **'WITHOUT PREJUDICE.'** At the time, she had no reason to believe that Dearborn's predecessor had granted her application for insurance on her own life, but denied – without acknowledgment or explanation – the portion of her application seeking to insure her husband's life."

ROA.319-320.

In summary, the District Court failed to acknowledge Ms. St. Pierre's most significant and well pleaded facts, almost all of them based on documentary evidence and reasonable inferences therefrom.  On the few occasions where the standard of review required the District Court to take her word for it, the Court implicitly took issue with her, such as by changing "reasonably inferred" to "incorrectly assumed;" and prefacing Ms. Michel's admission of a mistake with "according to Plaintiff."  Most significantly of all, it did not consider her emphatic denial of Dearborn's claim that, before her last open enrollment, she reviewed her benefits and made no changes.

### District Court Articulates, But Does Not Apply, Pleading Standard

The District Court does correctly articulate the applicable pleading standard. ROA.689-690. However, in the ensuing 12 and a half page legal discussion, the

word "plausible" appears only once, as part of a defense argument which the Court sustained.  ROA.694-695.  The language about drawing inferences appears only three times in paragraphs rejecting Ms. St. Pierre's statements of fact as legally insufficient.  ROA.696; ROA.698.  Acceptance of Ms. St. Pierre's allegations as the truth gets similar treatment – a single statement that even by that lax standard, the allegation in question is legally insufficient.  ROA.701. The words "light most favorable" do not appear anywhere at all, except in the articulation of the pleading standard.

## Issue Number 2

**On the applicability of Texas common law agency principles, the District Court erred as a matter of law by placing upon Ms. St. Pierre the burden of negating the unpled and disputed affirmative defense that the Texas Insurance Code preempted Texas common law.**

### Introduction

Ms. St. Pierre originally filed suit against Dearborn only, based mostly on the facts alleged herein.[6]  In that prior suit, Ms. St. Pierre alleged an agency relationship between the company and the City based on Texas Insurance Code, Section 4001.003(1).  The Court found as a matter of law that the City, as employer, could not be an agent based on an exclusion found in Section

---

[6] The District Court's order in the prior litigation is part of the Record on Appeal in this case, as an attachment to Plaintiff's Response to Defendant's Motion to Dismiss in this case.  ROA.641-664.

4001.003(1)(B).   ROA.648-649.   In the instant lawsuit, adding Standard as a Defendant, Ms. St. Pierre alleged an agency relationship under Texas common law, stating that Texas law on this point is not preempted by the Insurance Code. ROA.311; ROA.321.   In its motion to dismiss, Dearborn relied on its prior victory as collateral estoppel in this suit. ROA.560-561. (motion); ROA.667. (reply in support.)  The District Court decided the issue as follows:

> "Plaintiff has not cited any authority, common law or otherwise, that would enable the Court to find an agency relationship, nor has she provided any reason why common law should displace the legitimate preferences that are codified in the Texas Insurance Code.   Given Plaintiff's complete failure to substantiate her claim, the Court determines that its prior ruling applies in the instant case.   Thus the City did not act as an agent of either Defendant Standard or Defendant Dearborn."

ROA.691.

## Correct Burden of Pleading and Proof

Under the Federal Rules of Civil Procedure, preemption is ordinarily a defense to a plaintiff's suit, *MetLife Insurance Company v. Taylor*, 481 U.S. 58, 63 (1987) which a defendant must plead and prove.  *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012).  This is so even under ERISA "super preemption."  *Bank of Louisiana v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 242 (5th Cir. 2006). "Unless the complaint itself establishes the applicability of a federal preemption defense, in which case the issue may properly be the subject of a Rule 12(b)(6) motion, a defendant should ordinarily raise preemption in a 12(c) motion for

judgment on the pleadings or a Rule 56 motion for summary judgment." *Fisher*, 667 F.3d at 609.

It is indisputable, based on documentary evidence, that both of the Defendant insurance companies promised they would provide training and support, including attendance at open enrollment, to make sure that City employees knew their rights and responsibilities and had the means to carry out the latter. Ms. St. Pierre plausibly alleges that both companies broke these promises at times which were critical to her obtaining insurance on her husband's life. It is manifestly reasonable to infer that the companies' defaults required City employees to step into the breach and provide the best support they could. It was not enough to get Ms. St. Pierre, and perhaps others, through the maze and to her goal.

An analogous situation would be where a licensed insurance broker or agent delegates her licensee's responsibilities under Texas Insurance Code §§ 4001.051 and .052 to someone who is not licensed to perform those functions. The unlicensed delegee commits deceptive acts or practices which result in one or more customers not having the coverage they had bargained for. To follow Appellees' logic, the unlucky customers would have remedies only against the unlicensed broker who would almost certainly be insolvent, if not incarcerated.

### Texas Common Law of Agency – Preemption Uncertain

What prevents such a plainly unjust result is Texas common law. The Texas Supreme Court has held that the Insurance Code is not necessarily preemptive of common law, but does so "when necessary to serve the Code's purposes." *Crown Life Insurance Company v. Casteel*, 22 S.W.2d 378, 385 (Tex. 2000). It does not serve the purpose of the Insurance Code to insulate a provider of group life insurance from liability for the acts of apparently unqualified City employees performing without promised support from the providers.

Other state cases leave the preemptive force of the Insurance Code uncertain. See, e.g., *Life Insurance Company v. Klingler*, 730 S.W.2d 32, 34-35 (Tex. App.-Corpus Christi 1987) (Insurance Code not preemptive of common law interpretation of death/dismemberment insurance); *Universe Life Insurance Company v. Giles*, 950 S.W.2d 48, 55-56 (Tex. 1997) (Insurance Code Article 21.21, Section 4 effectively preempts common law in bad faith cases); *Lennar Corp. v. Great American Insurance Company*, 200 S.W.3d 651, 701-702 (Tex. App.-Houston [14] 2006) (wrongful termination or rescission of a policy not preempted); *National Plan Administrators Inc. v. National Health Insurance Company*, 2004 Tex. App. LEXIS 10257 ** 21-28 (Tex. App.-Austin 2004) (common law agency principal's fiduciary duties not preempted).

40

## Texas Common Law Agency Principles

Under Texas common law, "an agent is one who consents to the control of another, the principal, who has manifested consent that the agent shall so act. An agency relationship does not depend on the express appointment or assent of the principal; rather it may be implied from the conduct of the parties." *Walker Insurance Services v. Bottle Creek Power Corp.*, 108 S.W.2d 538, 549 (Tex. App.-Houston [14] 2003). The Court further stated, "An agency relationship may be found from underlying facts or direct or circumstantial evidence showing the relationship of the parties. An 'agent' is one who is authorized by a person or entity to transact business or manage some affair for the person or entity. An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. This right includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task." Id.

An agency relationship may be implied from the conduct of the parties. Further, both the agency and the extent of the agent's authority may be proved by circumstantial evidence. *Jarvis v. K & E Re One LLC*, 390 S.W.3d 631, 641 (Tex. App.-Dallas 2012, citing numerous cases).

Ms. St. Pierre is presently without knowledge of the interactions between City employees and the companies. The possibilities on the City's side range from

"get down here, we need help," to "don't bother to show up, we can handle everything." However, the documentary evidence presently available and Ms. St. Pierre's recollections of her enrollment experiences give plausibility to her inferences of agency relationships between the companies as principals and the City employees as agents, and Ms. St. Pierre's status as an intended third party beneficiary of the contracts at issue.

## Purpose of Key Insurance Code Provision

Had Defendants recognized their duty to plead and prove preemption, it probably would have looked like page 40, supra, this brief. If and when the Supreme Court resolves this issue, what will probably carry the day against preemption is that the manifest purpose of the Insurance Code's exemption of employers from the Code's definition of agent is to protect honest, but inexperienced, employers from ruinous liability for innocent mistakes. The purpose is not to immunize insurance companies against responsibility for ignoring promises they make to public entities or private businesses, to the detriment of innocent employees like Vanessa St. Pierre.

## Issue Number 3

**The District Court erred as a matter of law by engrafting onto the *Twombly-Iqbal* standard a requirement, unrelated thereto, for a "connection" or "tie" or some other sort of linkage between the presumptively true statements of fact and the causes of action.**

42

**No Case Support for Tying**

In so doing, the District Court followed a suggestion from Defendants:

"Plaintiff includes a laundry list of alleged violations of Chapter 541 of the Texas Insurance Code and DTPA without tying any of those alleged violations to any of the so-called facts she pleaded in her statement of facts; which is insufficient under both *Iqbal* and *Twombly*. Accordingly, Plaintiff's claims of Texas Insurance Code and DTPA violations must be dismissed."

ROA.563.

The Court pursued this unsupported claim of a "tying" requirement throughout its rejection of every single claim made by Ms. St. Pierre. It began by imposing on Ms. St. Pierre a requirement to show a connection between her legal claims and facts pled (ROA.692.) and then explained this holding: "Plaintiff has failed to tie any of her factual averments to her causes of action in her Complaint" (ROA.693. n. 5), a close paraphrase of the language in the motion.

The reason why neither the motion nor the Court's opinion cites a page of either *Twombly* or *Iqbal* is that there is no such requirement in either case. The only use of the verb to "connect" is in a note to Justice Stevens' *Twombly* dissent where he talks about the "causal connection . . . between that loss and the alleged [misrepresentation]." *Twombly*, 550 U.S. at 588 n. 8.

The Supreme Court has rejected, at least in very strongly worded dictum, Defendants' unsupported argument and the Court's acceptance of it:

43

> "Our decisions in [*Twombly* and *Iqbal*] are not in point, for they concern the factual allegations a complaint must contain to survive a motion to dismiss.   A plaintiff, they instruct, must plead facts sufficient to show that her claim has substantive plausibility.  Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of adequate statement of their claim.   The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary for plaintiff's claim for relief."

*Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

The Supreme Court's guidance is important because it makes clear that *Twombly* and *Iqbal* did not change basic pleading rules.   By their terms, they permit pre-discovery dismissal only when the facts are so implausible that they do not fit any conceivable cause of action.   Rule 54(c) Fed. R. Civ. P. has provided before, and throughout the *Twombly-Iqbal* era, that "every final judgment should contain the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

This Court has held "a party may be awarded the damages established in the pleadings or the facts proven at trial, even though only injunctive relief was demanded in the complaint.'  But failure to seek a form of permissible relief in a party's pleadings may operate to prejudice the opposing party when relief is finally sought **at a much later stage of the proceedings**.   Denial of relief is then also appropriate."  *Peterson v. Bell Helicopter Textron Inc.*, 806 F.3d 335, 340 (5th Cir. 2015) (emphasis supplied).

Despite not having to plead any legal theories, Ms. St. Pierre did so to enhance the plausibility of her claims with legal support. The District Court called that approach "her misfortune" and her counsel's work as "inartful pleading." ROA.692-693. Adjectives are always in the eye of the beholder. None of the jurisprudence under Rule 12(b)(6) has ever required a plaintiff to dissect what limited evidence she has before getting discovery, matching it up with elements of the various causes of action, and establishing not just that her claims are plausible, but probably successful.

### District Court's Reliance on Tying Analysis

In almost every single page of its legal analysis, the Court finds fault based on different versions of the connection/tying requirement. The following examples are illustrative only.

1.    "Plaintiff has not identified what material facts Defendants failed to state that caused other statements to be misleading, or what statements were made in a manner that would mislead a reasonably prudent person – let alone how her injury was caused by said omissions or statements." ROA.693. The Court leaves out the critical fact that it had earlier recognized, that Ms. St, Pierre is suing as a third party beneficiary. The gravamen of her claims is that the Defendant insurance companies committed deceptive acts and practices and made misleading statements **to the City**, and to the detriment of Ms. St. Pierre, as third party

beneficiary.  Under the Texas Insurance Code, a city employee, covered under the city's self-funded accident insurance plan, has been allowed by a Texas court to sue for the unfair practices allegedly committed by an insurance company hired by the city to administer its plan.  *Benefit Trust Life Insurance Company v. Littles*, 869 S.W.2d 453, 464 (Tex. App.-San Antonio 1993), vacated for settlement 873 S.W.2d 704 (Tex. 1994).

2.    "Instead, most of Plaintiff's allegations appear to designate the City as the wrongdoer in this case, not the Defendants."  ROA.694.  Accusing the City of wrongdoing would be an implausible statement of fact, first because the City did not do anything deceptive or misleading; it merely made mistakes through its inexperience, which was the fault of the insurers.  Furthermore, the City has governmental immunity.  As an example of Ms. St. Pierre's blaming the City, the Court in the same paragraph points out that Ms. Michel apologized for the failure to deduct the proper amount of insurance premiums from her pay.  Ms. Michel's mistake may have been an inadvertent clerical error or omission for which Ms. St. Pierre would be entitled to relief under the express terms of the life insurance policy, although the remedy is uncertain.

3.    That, of course, is a moot point since the Court implicitly found Ms. St. Pierre's possible claim to be implausible because she fails to allege "any conduct on the part of Defendant Dearborn that breached the terms of the

employment contract nor how Plaintiff suffered damages as a result." ROA.701. How about denying her claim, refusing to pay her anything but the $2,000 that all employees get for loss of a spouse, and refusing even to consider whether the series of unfortunate events which Ms. St. Pierre experienced might have met Dearborn's presently unknown definition of "clerical error?"

4.     "Plaintiff once again fails to distinguish between the actions of Defendant Standard and Defendant Dearborn despite each Defendant's distinct role in the case.  Plaintiff's lack of specificity compounds the other failings in her complaint."  ROA.696.  Although the District Court pretermitted discussion of almost all of her factual claims, it is absolutely clear from the summary of facts that the Complaint carefully and separately details the act and omissions of each Defendant to the extent possible with the paucity of information available to Ms. St. Pierre and her counsel at the initial pleading stage.

5.     "Nowhere in her Amended Complaint does she allege Defendants misrepresented to the City or to her that the employee benefit plan conferred rights, remedies or obligations which it did not in fact involve.  Consequently she has not sufficiently pleaded a claim for relief."  ROA.696.  Once again, the record simply does not support this statement.  The documentary evidence attached to the Complaint and summarized in the factual portion of this brief go way beyond plausibility, verging on indisputability, of what gaudy promises each Defendant

made to the City, and reasonable inference thresholds to show that neither company had any intentions of fulfilling its promises.

6.    The Court dismissed Ms. St. Pierre's second DTPA claim, intentional omission of a material fact.  It pointed out the requirement of "intent to deceive [Plaintiff]" by not disclosing the information and that Plaintiff "demonstrate" she would not have entered into the transaction had the information been disclosed. ROA.696.  First, the Court continues to ignore Ms. St. Pierre's status as a third party beneficiary, alleging that each insurance company successively engaged in deceptive conduct toward the City, to her detriment.  This is a recognized cause of action under the Deceptive Trade Practices Act.  *Service Corp. International v. Residential Services, L.P.*, 129 S.W.3d 781, 793 (Tex. App.-Houston [1] 2004, pet. denied).  Suppose instead of its pre-contract representations, which have been exhaustively summarized in the factual portion of this brief, Standard had said, "We reserve the right to add an insurability requirement for life insurance, notwithstanding what we have said in trying to become your insurer.  We may require it as to both employee and dependent coverage, or we can require it for one and not the other, and we don't have to tell you or the employees what's going on. And that promise to have representatives at new employee orientation, whether or not we show up, depends on how busy we are elsewhere."  And suppose Dearborn had said, "True, we promise responsibility for day-to-day contact with your chosen

staff to answer . . . questions and ensure services and needs are handled quickly effectively, and to facilitate client service training with the City's benefit staff. Just don't be surprised if the persons we have assisted and trained operate at a skill level below what is required. And don't be misled by the geographic proximity of our office to City Hall.  We retain the right to decide finally whether or not we need to check in at our first annual enrollment as your insurer to make sure things are going smoothly."  From what was promised and what was given in the City's relationship with its insurers, it is reasonable to infer, at least at this early stage, that the truth would have looked something like that, and the City would have looked elsewhere for companies who don't think promises are like pie crusts, made to be broken.

7.     "And finally, even when presuming that Plaintiff's allegations embrace those specific facts necessary to support her DTPA claims – which they do not – Plaintiff has not alleged that she relied to her detriment on any purported false, misleading, or deceptive acts made by Defendants."   ROA.697.  That proof is not required.  The City relied on its insurers' reassuring promises leading up to the actual making of the contract, and that was to the detriment of Ms. St. Pierre. Over and over again, the District Court failed to account for Ms. St. Pierre's undisputed status as a third party beneficiary of the agreements in question and the legitimacy of such claims under Texas law.

8.     While dismissing Ms. St. Pierre's promissory estoppel claim, the Court found Defendants' promises were "not sufficiently specific and definite as would be reasonable for [Plaintiff] to rely on as a commitment to future action. Moreover, Plaintiff does not allege that her substantial and reasonable reliance on the promise was to her detriment." ROA.699.  The Court does not acknowledge case law under which Texas third party beneficiaries have standing to assert against the promisor.  See, e.g., *City of San Antonio v. Valemas, Inc.*, 2012 Tex. App. LEXIS 4646 at *2-3 (Tex. App.-San Antonio 2012); *Fretz Construction Company v. Southern National Bank*, 626 S.W.2d 478, 479 (Tex. 1981).  The alleged lack of specificity and definition makes sense only if one reads the record as the District Court did, without summarizing all the specific and definite promises made by Defendants.

9.     Farther down the page, the Court refers to its conclusion that Ms. St. Pierre failed to satisfy her supposed burden to negate preemption.  At the bottom of the page, the Court adds that Ms. St. Pierre had no proof that she relied on the promise to her detriment.  ROA.699.  Of course not.  She's a third party beneficiary.  It was the City that relied on its insurers.

10.     Finally, the District Court addresses the breach of contract claim against Dearborn, arising from its opaque commitment to provide some unspecified redress for inadvertent clerical error or omission.  It even reiterates the

50

contract language.  Cf. ROA.426. and ROA.700.  However, the Court goes further: "By Plaintiff's own pleadings, she was denied coverage because she failed to provide an evidence-of-insurability form to Defendant Standard and thus was never grandfathered into Dearborn's insurance plan."  ROA.701.  The commitment to provide some sort of redress about inadvertent clerical omissions does not say a single word about whose omissions would trigger the clause.  And just for the record, Ms. St. Pierre makes a plausible case for clerical errors on the parts of Standard, the City, or both.  Dearborn itself made an obvious error of some kind interpreting Ms. St. Pierre's signing on electronically to say she wanted no change in her benefits as a smoking gun that she knew she had no coverage on her husband's life when she went to open enrollment shortly thereafter.

11.     The District Court then points out that Ms. St. Pierre's counsel did not mention the obvious ambiguity in the contract until he responded to the motion to dismiss.  The Court treats that "as an attempt to unilaterally amend her  Amended Complaint after the December 21, 2020 deadline to do so."  ROA.701-702.  The ambiguity is apparent on the face of the provision.  Counsel did not amend the Complaint; he merely pointed out the obvious.

12.     The District Court then goes to some length to say the contract is not ambiguous, citing various authorities, and makes the curious statement, "Plaintiff has not pleaded sufficient facts to show ambiguity," nor stated how terms like

"inadvertent error" and "clerical or omission" . . . "invite multiple interpretations."

ROA.702.  For the record, Ms. St. Pierre tried without success to find out how

Dearborn defines those terms.  The Court characterizes raising the ambiguity

patent on the face of the contract as "nothing more than a last-ditch effort to

survive Defendants' Motion to Dismiss."  ROA.702.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiff-Appellant

respectfully prays that this Court reverse the Opinion and Order and the Final

Judgment of the District Court and remand this case to it for further proceedings,

including appropriate discovery and full consideration on the merits.

RESPECTFULLY SUBMITTED this 22nd day of November, 2021.


*/s/ Michael T. Milligan*
**MICHAEL T. MILLIGAN**
4171 N. Mesa St., Suite B-201
El Paso, Texas 79902
915-544-5587
915-544-2773
Email:  elpasomike13@aol.com
Texas Bar No. 14148200

ATTORNEY FOR PLAINTIFF-
APPELLANT

## CERTIFICATE OF SERVICE

This is to certify that, on November 22, 2021, the foregoing document has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on all registered counsel of record:

Andrew F. MacRae
Levantino Pace PLLC
1101 Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
Email: andrew@lpfirm.com

Richard Bonner
Kemp Smith LLP
P. O. Box 2800
El Paso, Texas 79999
Email: richard.bonner@kempsmith.com

_/s/ Michael T. Milligan_
MICHAEL T. MILLIGAN

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,556 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 10 in 14-point Times New Roman font.

_/s/ Michael T. Milligan_
MICHAEL T. MILLIGAN
Attorney for Plaintiff-Appellant